# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00032-COA

**TANYA MICHELLE DORSEY A/K/A TANYA DORSEY**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                                      **APPELLEE**

DATE OF JUDGMENT:               09/25/2019
TRIAL JUDGE:                          HON. JOHN HUEY EMFINGER
COURT FROM WHICH APPEALED:   RANKIN COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:       OFFICE OF STATE PUBLIC DEFENDER
                                         BY: W. DANIEL HINCHCLIFF
ATTORNEY FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                                         BY: ALLISON ELIZABETH HORNE
DISTRICT ATTORNEY:               JOHN K. BRAMLETT JR.
NATURE OF THE CASE:             CRIMINAL - FELONY
DISPOSITION:                        AFFIRMED - 02/02/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE WILSON, P.J., McDONALD AND LAWRENCE, JJ.

### McDONALD, J., FOR THE COURT:

¶1.     On August 9, 2019, a Rankin County Circuit Court jury found Tanya Michelle Dorsey guilty of shooting into the dwelling house of Christopher and Leslie Smith. The circuit court sentenced Dorsey to ten years in the custody of the Mississippi Department of Corrections (MDOC) with four years suspended and six years to serve, followed by five years of supervised probation. Dorsey filed a motion for judgment notwithstanding the verdict (JNOV), a motion to vacate the judgment, and motion for a new trial on October 7, 2019. The circuit court denied Dorsey's motions. On January 8, 2020, Dorsey appealed, raising the

following issues: (1) whether the circuit court erred in failing to conduct a competency hearing immediately prior to trial; (2) whether the circuit court erred in failing to grant a mistrial where the prosecutor argued facts specifically excluded from evidence by the court; and (3) whether the circuit court erred in sentencing Dorsey to a term that exceeds the statutory limitation. Finding no error, we affirm.

**Statement of the Facts and Procedural History**

¶2. For several years, Dorsey lived at a house located at 504 Pine Park Cove, Brandon, Mississippi. On July 25, 2011, Christopher and Leslie Smith (the Smiths) became Dorsey's next-door neighbors. Christopher described his relationship with Dorsey as "initially awkward," but Leslie described her relationship with Dorsey as friendly. According to Christopher, his relationship with Dorsey worsened toward the end of 2016 because he had installed security cameras around his house.[1]

¶3. In December 2017, Dorsey went to Christopher's place of employment at the University of Mississippi Medical Center (UMMC), where Christopher worked for the systems administration department. Upon her arrival, the first person that Dorsey encountered was Russell Donald. Dorsey told Donald that she would like to speak to Christopher's supervisor. Donald informed Dorsey that he was the director of information technology for UMMC, so she could speak to him. Dorsey told Donald that she was Christopher's neighbor, that they had known each other for some time, and that they talked about cars since they both had Lexus vehicles. Then Dorsey told Donald that Christopher

---

[1] Dorsey alleged that the Smiths were spying on her using the security cameras.

had begun harassing her and caused her internet service to be disconnected. She also told Donald that Christopher did not want to be with Leslie anymore. Dorsey showed Donald paperwork that indicated that she had contacted the sheriff's department.[2] Donald told her that it sounded like a civil matter, so she needed to handle it in court. Dorsey thanked Donald and left the premises. By that time, Christopher had already left work for the day.

¶4. Christopher learned that Dorsey had come to his workplace, and as a result, he filed a report with the UMMC campus police. In the same month, Dorsey moved out of her house. According to the Smiths, they had not seen or heard from Dorsey again until March 2018.

¶5. On the morning of March 23, 2018, around 6:30 a.m., while Christopher was preparing for work and Leslie was in the bathroom in their house, the Smiths heard three "pops." Christopher went into the kitchen and discovered bullet holes in their kitchen window and shattered glass and debris on the floor. He found a bullet that had gone through cabinets and another bullet lodged in the crown molding. The Smiths reviewed their home-security camera footage and saw a 2003 silver Lexus driving by at the time of the shooting. The video also showed three flashes coming from the vehicle. Because they had been neighbors for several years, the Smiths recognized the car as Dorsey's and called the police.

¶6. Investigator Brett McAlpin of the Rankin County Sheriff's Department responded to the call. He assessed the scene and discovered two bullets in the kitchen. He was able to recover the bullet from the crown molding but could not recover the other bullet because it had fallen into the cavity of the wall. McAlpin secured the evidence for transfer and

---

[2] The record is not clear what documents Dorsey provided Donald.

examination by the state crime lab. McAlpin also reviewed the Smiths' security video footage. The Smiths told McAlpin that they suspected Dorsey was the shooter because the footage showed a silver Lexus, which they were aware that Dorsey owned. McAlpin called the sheriff's department to see if any vehicles were registered in Dorsey's name. Dispatch confirmed that Dorsey had a silver Lexus registered in her name. McAlpin obtained Dorsey's tag number and contacted Ricky Davis of the Flowood Police Department to pull information regarding her tag from the city's license plate reader (LPR) system. The LPR showed that Dorsey traveled in the direction of the Smiths' home at 6:18 a.m. and traveled opposite of that direction at 6:48 a.m.

¶7. Based on the information McAlpin received from Davis, McAlpin obtained an arrest warrant for Dorsey. She was arrested the same day of a shooting at an apartment complex where Dorsey resided with Daniel Bowman.[3] United States Marshals Fugitive Task Force Officer Wes Shivers arrested Dorsey at Bowman's apartment as she was getting into her vehicle, a silver Lexus. Officer Shivers searched Dorsey's person and property without a search warrant and found a .22-caliber Beretta pistol in the glove box of her car.[4]

---

[3] According to Bowman, he and Dorsey did not have a romantic relationship, but he allowed her to stay at his apartment because she was going through financial hardship.

[4] Dorsey did not challenge the admission of the gun as evidence at trial, nor does she raise on appeal whether it was properly seized. Therefore, any argument on that issue is waived. *Donaldson v. State*, 62 So. 3d 1135, 1153 (¶67) (Miss. Ct. App. 2018), *cert. denied*, 260 So. 3d 800 (Miss. 2019). Regardless, "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross*, 456 U.S. 798, 820-21 (1982) authorizes a [warrantless] search of any area of the vehicle in which the evidence might be found." *Garth v. State*, 191 So. 3d 730, 731 (¶7) (Miss. Ct. App. 2015) (citing *Arizona v. Gant*, 556 U.S. 332, 347 (2009)). Since Dorsey was alleged to have fired a gun from inside her car, it was logical to reason that the gun was in the vehicle. Therefore, a warrantless

Investigator McAlpin performed a gunshot-residue (GSR) test on Dorsey's palms following her arrest. David Whitehead, a trace-evidence forensics expert for the Mississippi Forensics Laboratory, identified particles of gunshot residue on Dorsey's palms and on the back of her hands. Tommy Bishop, a firearms examination expert for the Mississippi Forensics Laboratory, examined the pistol found in Dorsey's glove compartment and the bullet and determined that they had the similarities and class characteristics consistent with at least one of the bullets found in the Smiths' home. But Bishop could not say whether the bullet was fired from Dorsey's gun primarily because the bullet was damaged. However, the projectile retrieved at the scene was the same caliber and had the same number of "lands and grooves" as Dorsey's gun.[5]

¶8. Furthermore, according to Bowman, on the morning of the shooting, he heard Dorsey leave the apartment around 6:00 a.m. or 6:30 a.m. After Dorsey returned to the apartment around 9:30 a.m., she showed him two spent shell casings before throwing them in the trash. Bowman also stated that prior to the day of the shooting, Dorsey told him about the Smiths and how they tried to spy on her when they were neighbors. Dorsey had previously taken Bowman to her old neighborhood and showed him her old house and the Smiths' house. Bowman testified that he previously had seen Dorsey with a .22-caliber gun, which she normally kept in her purse. Dorsey had also told Bowman that she enjoyed driving around by herself and firing her gun, shooting bullets out of her vehicle.

search incident to her arrest was permissible. *Id*.

[5] "Lands and grooves" are structures that are cut in a twisting pattern into the barrel of a firearm, which leave distinctive marks on the projectiles shot.

## A. Dorsey's Ability to Stand Trial

¶9. Prior to Dorsey's indictment, the County Court of Rankin County ordered Dorsey to undergo a psychological evaluation due to her inability to effectively communicate with the court and her counsel.[6] Dr. Criss Lott evaluated Dorsey on April 5, 2018, and May 3, 2018, and provided the following in his report:

> **ADJUDICATIVE COMPETENCY:**
>
> It is my opinion, to a reasonable degree of psychological certainty, that Ms. Dorsey does not have sufficient present ability to confer with her attorney with a reasonable degree of rational understanding, and she does not have a factual and rational understanding of the nature and object of the legal proceedings against her. Ms. Dorsey appeared actively mentally ill and is need of treatment.
>
> **MENTAL STATE AT TIME OF ALLEGED OFFENSE:**
>
> I am unable to offer an opinion regarding Ms. Dorsey's mental state at the time of the index offense[7] as she was actively mentally ill and did not appear competent to proceed to trial.

After Dr. Lott's evaluation, Dorsey received treatment through Region 8 Mental Health Services.

¶10. On July 2, 2018, a Rankin County grand jury indicted Dorsey for shooting into a

---

[6] The county court's order is not in the record but was referenced in a subsequent motion for a mental examination after the indictment.

[7] Black Law Dictionary defines an "index offense" as one of the eight classes of crimes that are reported annually to the Federal Bureau of Investigation (FBI), including, murder, non-negligent homicide, rape, robbery, aggravated assault, burglary, larceny-theft, arson, and auto theft. *Index Offense*, Black's Law Dictionary 1109 (7th ed. 1999). However, Dorsey was not charged with any index offense.

dwelling house pursuant to Mississippi Code Annotated section 97-37-29 (Rev. 2014).[8]

During her arraignment, Dorsey pled not guilty on August 25, 2018.

¶11. Dorsey filed a motion for a mental examination and for a continuance pursuant to Rule 12.2 of the Mississippi Rules of Criminal Procedure [9]and Mississippi Code Annotated section 99-13-11 (Rev. 2015)[10] on January 3, 2019. Dorsey argued that she needed a follow-up examination and that she was not sane at the time the offense was committed. That same day, Dorsey filed a notice of insanity defense pursuant to Rule 17.4 of the Mississippi Rules of Criminal Procedure.[11] The court scheduled a competency hearing for January 22, 2019.

¶12. Dr. Lott examined Dorsey again on January 19, 2019, and January 22, 2019. Dr. Lott

---

[8] "If any person shall willfully and unlawfully shoot or discharge any pistol, shotgun, rifle or firearm of any nature or description into any dwelling house or any other building usually occupied by persons, whether actually occupied or not, he shall be a felony whether or not anybody be injured thereby and, on conviction thereof, shall be punished by imprisonment in the state penitentiary for a term not to exceed ten (10) years, or by imprisonment in the county jail for not more than one (1) year, or by fine of not more than five thousand dollars ($5,000.00), or by both such imprisonment and fine, within the discretion of the court." Miss. Code Ann. § 97-37-29.

[9] "If at any time before or after indictment, the court, on its own motion or the motion of any party, has reasonable grounds to believe that the defendant is mentally incompetent, the court shall order the defendant to submit to a mental examination." MRCrP 12.2(a).

[10] "In any criminal action in which the mental competency of a person charged with a felony is in question, the circuit or county court or judge in vacation on motion duly made by the defendant or the district attorney, or on the motion of the court or judge, may order the person to submit to a mental examination by a competent psychiatrist or psychologist selected by the court to determine his ability to make a defense; any cost or expense in connection with such mental examination shall be paid by the county in which the criminal action is pending." Miss. Code Ann. § 99-13-11.

[11] "If a defendant intends to rely upon the defense of insanity at the time of the alleged crime, the defendant shall, within the time provided for filing pretrial motions or at such later time as the court may direct, serve upon the prosecuting attorney and the clerk of the court a written notice of the intention to offer a defense of insanity." MRCrP 17.4(b)(1).

testified that when he met with Dorsey on January 19, "she was unable to give succinct answers to simple questions, [and] she was able to pose direct questions." When he met with Dorsey on January 22, Dr. Lott testified that she was much more succinct, reasonable, and rational in her responses. Dr. Lott testified that Dorsey was coherent and was able to understand the nature of the proceedings against her. Moreover, Dorsey had been treated for Attention Deficit Hyperactivity Disorder (ADHD) and Obsessive Compulsive Disorder (OCD). She also had been treated for depression. Dr. Lott testified that Dorsey had been compliant with his recommendations and treatments. Based on these findings, Dr. Lott concluded that Dorsey would be able to assist and communicate rationally with her attorney during a hearing or a trial.

¶13.    Dorsey's sister, Valencia Moses, also testified at the competency hearing, stating that she provided transportation for Dorsey so that she could attend her medical treatments. Dorsey had regularly attended treatments and was always on time. Moses testified that she felt Dorsey had ADHD but that Dorsey was accustomed to it. Dorsey had always been "hyped." Moses was in the courtroom during Dr. Lott's testimony and agreed that she could see the changes in her sister's behavior since treatment and that Dorsey was "doing a lot better." Moses testified that Region 8 was no longer giving Dorsey ADHD medicine. Dorsey was seeing a psychologist once a month. Moses also testified that Dorsey reported to court services every Sunday. Region 8 also provided Dorsey with a home through the Choice Muta Program, and Dorsey was no longer homeless. Based on Dr. Lott's and Moses's testimonies, the court found that Dorsey was competent to stand trial and incorporated that ruling into an order on January 31, 2019.

¶14.    The State moved the court for an additional mental examination of Dorsey on April

4, 2019, because of Dorsey's insanity defense and the need for an expert to conduct a mental

evaluation.  The court held a hearing on April 15, 2019, and allowed the defense to have

Dorsey privately evaluated to determine whether her *M'Naghten* insanity defense[12] could

move forward.

¶15.    During the pretrial motions hearing, on July 24, 2019, Dorsey instructed her counsel

to withdraw the insanity defense.  Dorsey's counsel explained that he told Dorsey about the

potential consequences of her decision.  The court asked Dorsey whether she no longer

wished to put on a defense of insanity, and she responded, "[T]hat's my decision, yes, sir."

The State therefore no longer needed Dorsey to have a mental evaluation.

### B.    Trial

¶16.    Prior to trial, on August 8, 2019, the court heard the defense's motion to exclude the

introduction of evidence obtained from a license plate reader (LPR) that purportedly recorded

Dorsey's license plate number as her vehicle entered Rankin County.  The defense argued

that the testimony would be hearsay.  The court held the motion in abeyance until proof was

offered at trial.

¶17.    The trial took place on August 8-9, 2019.[13]  Several witnesses testified for the State,

including the Smiths, Brett McAlpin, Wes Shivers, Russell Donald, Tommy Bishop, David

---

[12] "The *M'Naghten* test for determining insanity is whether the accused knew right from wrong at the time the act was committed."  *Ealey v. State*, 158 So. 3d 283, 293 (¶32) (Miss. 2015) (quoting *Woodham v. State*, 779 So. 2d 158, 163 (¶27) (Miss. 2001)).

[13] The record indicates that the State offered Dorsey several plea offers, but she rejected them and elected to proceed to trial.

Whitehead, and Daniel Bowman. Significant to this appeal, when Investigator McAlpin began to testify about LPRs, the defense objected. The court sustained the objection but allowed the State to proffer McAlpin's testimony regarding his knowledge of the Dorsey's LPR information and how it assisted him in the development of the case outside of the presence of the jury. Although the State had a document that showed the LPR pictures of Dorsey's car and the times that the car came through the Lakeland Drive and Riverbend intersection, the court found that Investigator McAlpin could not testify that the document was a true and accurate copy of a record. Therefore, the court did not allow the document into evidence but did allow Investigator McAlpin to testify before the jury that he contacted Ricky Davis about information regarding the LPRs, the result of his investigation, and how that information led him to obtaining Dorsey's arrest warrant.

¶18. After the State rested, Dorsey's counsel moved for a directed verdict based on the State only having circumstantial evidence and not proving beyond a reasonable doubt that Dorsey was guilty of shooting into a dwelling house. Considering all of the evidence in the light most favorable to the State, the court denied the motion. Dorsey did not take the stand, nor did she present any witnesses to testify in her behalf.

¶19. During closing arguments, the State referred to Investigator McAlpin's development of Dorsey as a suspect. The State also referred to the LPR system, and Dorsey's counsel objected. The court sustained the objection. After the jury retired for deliberation, Dorsey moved for dismissal of the indictment or, in the alternative, a mistrial based on the State's mention of the LPR system during closing arguments. The State responded that the argument was proper because between the testimony of Investigator McAlpin and Officer Shivers, the

10

jury could have inferred that Dorsey's vehicle was identified on the LPR system as being in the area of Lakeland Drive. The court denied Dorsey's motion, stating that the defense counsel should have moved for a mistrial at the time of the objection and that there was already testimony before the jury regarding Dorsey's vehicle and the purpose of the LPR system through Investigator McAlpin's testimony. But Investigator McAlpin was not allowed to testify as to the specific information regarding Dorsey's information on the LPR system.

¶20. The jury returned a guilty verdict on August 9, 2019, for shooting into a dwelling house. The circuit court sentenced Dorsey to ten years in the custody of the Mississippi Department of Corrections (MDOC) with four years suspended and six years to serve, followed by five years of supervised probation on September 23, 2019, pursuant to Mississippi Code Annotated section 97-37-29. The circuit court entered the judgment of conviction and sentence on September 25, 2019.

¶21. Dorsey filed a motion for JNOV, a motion to vacate the judgment, and a motion for a new trial on October 7, 2019, for the following reasons relevant to this appeal: whether the court erred in numerous evidentiary rulings at trial, including failing to grant a mistrial when the district attorney mentioned in closing argument that the license plate reader was in the vicinity of the victim's house; and whether the sentence was disproportionate to the crime.

¶22. On October 17, 2019, the State responded to Dorsey's motion and argued that there was more than sufficient evidence to support Dorsey's conviction. Additionally, there was no misconduct on the part of the prosecutor during closing argument because the State did not directly refer to excluded evidence but "only inferred to permitted testimony."

11

Furthermore, that the sentencing was proper. After a hearing on the matter on December 16, 2019, the circuit court denied Dorsey's motions on January 6, 2020.

¶23. Dorsey appealed on January 8, 2020, raising the following issues: (1) whether the circuit court erred in failing to conduct a competency hearing immediately prior to trial; (2) whether the circuit court erred in failing to grant a mistrial where the prosecutor argued facts specifically excluded from evidence by the court; and (3) whether the circuit court erred in sentencing Dorsey to a term that exceeds the statutory limitation. Finding that the circuit court did not err, we affirm the court's rulings.

**Standard of Review**

¶24. The standard of review for an appellate court to review a defendant's competency is abuse of discretion. *Bradley v. State*, 116 So. 3d 1093, 1095-96 (¶14) (Miss. Ct. App. 2013). The inquiry is whether "the trial judge received information which, objectively considered, should reasonably have raised a doubt about the defendant's competence and alerted the judge to the possibility that the defendant could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense." *Id*. (quoting *Goff v. State*, 14 So. 3d 625, 644 (¶66) (Miss. 2009)).

¶25. "Our standard of review for a trial court's imposition of a sentence is abuse of discretion." *Foster v. State*, 148 So. 3d 1045, 1047 (¶7) (Miss. Ct. App. 2013) (quoting *Williams v. State*, 5 So. 3d 496, 505 (¶26) (Miss. Ct. App. 2008)). "Sentencing is within the complete discretion of the trial court and is not subject to appellate review if the sentence imposed is within the limits prescribed by statute." *Id*.

¶26. "Whether to grant a motion for a mistrial is within the sound discretion of the trial

12

court. The standard of review for denial of a motion for a mistrial is abuse of discretion." *Smith v. State*, 158 So. 3d 1182, 1185 (¶9) (Miss. Ct. App. 2015) (quoting *Gunn v. State*, 56 So. 3d 568, 571 (¶14) (Miss. 2011)).

¶27. "The standard of review which appellate courts must apply to lawyer misconduct during opening statements or closing arguments is 'whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created.'" *Johnson v. State*, No. 2017-KA-01483-COA, 2020 WL 1430497, at *7 (¶24) (Miss. Ct. App. 2020) (quoting *White v. State*, 228 So. 3d 893, 904 (¶28) (Miss. Ct. App. 2017)), *cert. denied*, 302 So. 3d 648 (Miss. 2020).

**Discussion**

**I.     Whether the circuit court erred in failing to conduct a competency hearing immediately prior to trial.**

¶28. Dorsey argues that she should have not gone to trial because she could not effectively and competently assist and participate in her own defense. She also argues that the circuit court committed reversible error by not sua sponte conducting a competency hearing on the day of the trial. After reviewing the record, we find that the circuit court did not err.

¶29. Mississippi Rule of Criminal Procedure 12.1 provides the following regarding mental competency:

> There is a presumption of mental competency. In order to be deemed mentally competent, a defendant must have the ability to perceive and understand the nature of the proceedings, to communicate rationally with the defendant's attorney about the case, to recall relevant facts, and to testify in the defendant's own defense, if appropriate. The presence of a mental illness, defect, or disability alone is not grounds for finding a defendant incompetent to stand trial. If as a result of mental illness, defect, or disability, a defendant lacks mental competency, then the defendant shall not be tried, convicted, or

13

sentenced for a criminal offense.

¶30. The Mississippi Supreme Court has stated that standard for competency to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "has a rational as well as a factual understanding of the proceedings against him." *Pitchford v. State*, 240 So. 3d 1061, 1067 (¶31) (Miss. 2017) (quoting *Gammage v. State*, 510 So. 2d 802, 803 (Miss. 1987)). The defendant bears the burden to prove "by substantial evidence that he or she is mentally incompetent to stand trial." *Id*. at (¶32) (quoting *Evans v. State*, 725 So. 2d 613, 660 (¶180) (Miss. 1997)).

¶31. We recognize that "the determination of the defendant's mental competency should be made at the earliest practicable date." MRCrP 12.2 cmt. "The United States Supreme Court has held that the failure to make a determination of competency when there are reasonable grounds to doubt such is fundamental constitutional error." *Id*.; *see Drope v. Missouri*, 420 U.S. 162, 175 (1975); *Pate v. Robinson*, 383 U.S. 375, 385 (1966); *House v. State*, 754 So. 2d 1147, 1152 (¶13) (Miss. 1999). "While there is no precise statement of what quantum of evidence necessitates a trial judge to order a mental evaluation, the United States Supreme Court has explained that 'evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required.'" *Bradley v. State*, 116 So. 3d 1093, 1096 (¶17) (Miss. Ct. App. 2013) (quoting *Drope*, 420 U.S. at 180)).

¶32. "A criminal defendant is presumed competent." *Moore v. State*, 287 So. 3d 189, 196 (¶21) (Miss. 2020) (quoting *Evans v. State*, 226 So. 3d 1, 14 (¶22) (Miss. 2017)). A

14

competent defendant is a person

> (1) who is able to perceive and understand the nature of the proceedings; (2) who is able to rationally communicate with his attorney about the case; (3) who is able to recall relevant facts; (4) who is able to testify in his own defense if appropriate; and (5) whose ability to satisfy the foregoing criteria is commensurate with the severity of the case.

*Id.* (quoting *Hollie v. State*, 174 So. 3d 824, 830 (¶19) (Miss. 2015)). The Mississippi Supreme Court has stated:

> [I]f before or during trial the court, of its own motion or upon motion of an attorney, has reasonable ground to believe that the defendant is incompetent to stand trial the court shall order the defendant to submit to a mental examination by some competent psychiatrist selected by the court[.]
>
> . . . .
>
> What constitutes 'reasonable ground' to believe that a defendant is incompetent to stand trial rests largely within the discretion of the trial judge. On review, the pertinent question is whether "the trial judge received information which, objectively considered, should reasonably have raised a doubt about defendant's competence and alerted him to the possibility that the defendant could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense."

*Hutto v. State*, 227 So. 3d 963, 976 (¶32) (Miss. 2017) (citations omitted) (quoting *Harden v. State*, 59 So. 3d 594, 601 (¶14) (Miss. 2011)).

¶33. In *Hutto*, our supreme court found that there was nothing in the record that demonstrated that the defendant was incompetent. *Id.* at (¶34). The supreme court reviewed the trial transcript and found that there was no indication that Hutto was incoherent and deluded during trial. *Id.* In fact, Hutto actively participated in the proceedings and engaged in discussions with his counsel. *Id.*

¶34. In this case, while Dorsey argues that the circuit court should have sua sponte ordered

15

another competency hearing on the first day of the trial, there is no evidence in the record that Dorsey was incompetent to stand trial. At the earliest possible date in 2018, the court found that Dorsey was incompetent to stand trial. Dorsey then began treatments at Region 8. After a second competency hearing in 2019, the court found that Dorsey was competent to stand trial after Dr. Lott's and Dorsey's sister's testimonies. After reviewing the trial transcript, there is no indication Dorsey showed signs of incompetency. Dorsey argues that she was incompetent because she detrimentally withdrew her insanity defense. But there is no proof in the record to indicate that she was not making a conscious decision. Furthermore, Dorsey's counsel did not request another mental examination prior to or on the first day of trial. Like *Hutto*, Dorsey actively participated in her proceedings and engaged in discussions with her counsel. Finding that there was no evidence or reasonable grounds that the circuit court should have sua sponte ordered a competency hearing based on Dorsey's demeanor at trial, this issue is without merit.

II. **Whether the circuit court erred in failing to grant a mistrial where the prosecutor allegedly argued facts specifically excluded from evidence by the court.**

¶35. Dorsey argues that because the State improperly referred to excluded evidence during its closing argument, the circuit court should have ordered a mistrial. After reviewing the record, we find that the circuit court did not err.

¶36. "The standard of review for denial of a motion for mistrial is abuse of discretion." *Bell v. State*, 303 So. 3d 22, 26 (¶10) (Miss. Ct. App. 2020) (quoting *Pilcher v. State*, 57 So. 3d 8, 10 (¶6) (Miss. Ct. App. 2010)), *cert. denied*, 303 So. 3d 418 (Miss. 2020). "Whether to grant a motion for mistrial is within the sound discretion of the trial court." *Id*. "The

16

Mississippi Supreme Court has held that 'a trial judge is best suited to determine the prejudicial effect of an objectionable remark and is given considerable discretion in deciding whether the remark is so prejudicial as to merit a mistrial.'" *Id.* (quoting *Flora v. State*, 925 So. 2d 797, 804 (¶5) (Miss. 2006)). "Unless 'serious and irreparable damage' results from an improper comment, the judge should 'admonish the jury then and there to disregard the improper comment.'" *Bell*, 303 So. 3d at 26 (¶10) (quoting *Pilcher*, 57 So. 3d at 10 (¶6)).

¶37. Although Dorsey argues that the court erred in denying her motion for mistrial, she also claims prosecutorial misconduct occurred during the closing argument. The standard of review for prosecutorial misconduct during opening statements or closing arguments is "whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Fortenberry v. State*, 191 So. 3d 1245, 1251 (¶18) (Miss. Ct. App. 2015) (quoting *Slaughter v. State*, 815 So. 2d 1122, 1130 (¶45) (Miss. 2002)). "Counsel is allowed considerable latitude in the argument of cases." *Id.* (quoting *Ivy v. State*, 589 So. 2d 1263, 1266 (Miss. 1991)). "He is not limited to the facts introduced into evidence, but he may argue the deductions and conclusions that may reasonably be drawn therefrom." *Id.*

¶38. We have held that in closing arguments, the State may properly argue its theory of the case, apply the law to the facts, and make deductions and conclusions based on the evidence presented at trial. *Shumaker v. State*, 956 So. 2d 1078, 1086 (¶20) (Miss. Ct. App. 2007). We have also found that testimony revealed at trial can be used to make inferences during the State's closing arguments. *Morris v. State*, 777 So. 2d 16, 30 (¶68) (Miss. 2000).

¶39. In the present case, the State made the following statement in its closing argument:

STATE: And then low and behold the Defendant's vehicle had been in Rankin County at that time period. That is how Brett McAlpin developed her as a suspect. It's coupled with the victims knowing immediately who did this to them. But then he had to do more police work. Because he has lots of other cases that he investigates and sometimes the victims are wrong. In this case, they were dead-on right. He developed her as a witness because a license plate reader on Lakeland Drive showed that the Defendant's vehicle had been on Lakeland Drive at this time. That's why –

DEFENSE: I'm going to object. That's evidence that is not in the record of this case and it's improper.

COURT: Sustained.

¶40. In its closing argument, the State reviewed Investigator McAlpin's testimony on how he developed Dorsey as a suspect. Investigator McAlpin had testified that he contacted Ricky Davis with the Flowood Police Department to obtain information regarding Dorsey's tag number from the city's LPR system. Investigator McAlpin explained the LPR system to the jury:

It's a license plate reader. It's equivalent to when you go – if you've ever been through a toll booth that reads you – reads your driver's license or reads your license plate and then later sends you a toll or a ticket, if you will, in the mail. It's equivalent to that. It's a system that reads every tag that comes in and out of a certain area; in our case, Rankin County.

¶41. The State also incorporated Officer Shivers's testimony into its closing argument. Officer Shivers's task force was requested to execute Dorsey's arrest warrant and bring her into custody. Officer Shivers testified that he used sources that led him to the LPR and that he found out where Dorsey's vehicle had been located. The State used Officer Shivers's testimony about Lakeland Drive, which included the distance and time between Bowman's apartment complex to the Smiths' home and whether there were a lot of traffic lights on

18

Lakeland Drive and the Smiths' home, to infer that Dorsey's car was on Lakeland Drive on the day of the shooting. Accordingly, by using the Investigator McAlpin's testimony regarding the LPR being in Rankin County and using Officer Shivers's testimony regarding Lakeland Drive, the State properly made an inference during closing arguments that the LPR showed that Dorsey's car was on Lakeland Drive on the day of the shooting. Therefore, the circuit court did not err in denying Dorsey's motion for mistrial.

¶42. Furthermore, we have held that "improper remarks made during closing arguments can be harmless error where the evidence of guilt is overwhelming." *Coleman v. State*, 223 So. 3d 790, 793 (¶14) (Miss. Ct. App. 2017) (quoting *Moffett v. State*, 156 So. 3d 835, 858 (¶65) (Miss. 2014)). Based on lay and expert witness testimonies, the ballistics and gun residue reports, and the photos and home security videotape, there was clear evidence to support the jury's finding that Dorsey was guilty of shooting into a dwelling house. Therefore, the circuit court properly denied Dorsey's motion for a mistrial based on the State's remarks in its closing arguments.

**III.    Whether the circuit court erred in sentencing Dorsey to a term that exceeds the statutory limitation.**

¶43. Pursuant to Mississippi Code Annotated section 97-37-29, the sentence for firing into a dwelling is "imprisonment in the state penitentiary for a term not to exceed ten (10) years, imprisonment in the county jail for not more than one (1) year, by fine of not more than five thousand dollars ($5,000.00), or by both such imprisonment and fine, within the discretion of the court."

¶44. Mississippi Code Annotated section 47-7-34(1) (Rev. 2015) provides the following

19

regarding sentencing:

> [T]he total number of years of incarceration plus the total number of years of *post-release supervision* shall not exceed the maximum sentence authorized to be imposed by law for the felony committed. The defendant shall be placed under post-release supervision upon release from the term of incarceration.

(Emphasis added). Mississippi Code Annotated section 47-7-33 (Rev. 2015) provides the court with the discretion to consider *probation*:

> When it appears to the satisfaction of any circuit court or county court in the State of Mississippi having original jurisdiction over criminal actions, or to the judge thereof, that the ends of justice and in the best interest of the public . . . [the court] shall have the power [to] place the defendant on probation.

Probation under section 47-7-33 is a conditional term that is not a part of the prison sentence and is therefore not subject to the "totality" of sentence concept found in section 47-7-34. *Carter v. State*, 754 So. 2d 1207, 1209 (¶5) (Miss. 2000).

¶45. This court has stated that the sentencing of a convicted criminal is within the discretion of the trial court. *Smith v. State*, 301 So. 3d 98, 102 (¶21) (Miss. Ct. App. 2020) (citing *Hayes v. State*, 203 So. 3d 1144, 1145 (¶3) (Miss. Ct. App. 2016)). "A defendant has a fundamental right to be free from an illegal sentence," and "a sentence is illegal when it exceeds the maximum authorized by law." *Id*. Generally, when a sentence "falls within the permissible range designated by statute," this Court will not disturb the sentence on appeal. *Id*.

¶46. "This Court has previously held, 'Time spent on probation is not included in the calculation of the maximum allowable sentence.'" *Fluker v. State*, 2 So. 3d 717, 719 (¶9) (Miss. Ct. App. 2008) (quoting *Brown v. State*, 872 So. 2d 96, 99 (¶10) (Miss. Ct. App. 2004)). Here, the circuit court sentenced Dorsey to a term of ten years in custody with four

years suspended. The maximum sentence for the crime of shooting into a dwelling is ten years of imprisonment. Miss. Code Ann. § 97-37-29. Although Dorsey was placed on five years of supervised probation, according to *Fluker* those years are not included in the calculation of her sentence. Dorsey's sentence clearly does not exceed the maximum statutory penalty. Therefore, this issue is without merit.

**Conclusion**

¶47. Finding that there is no reversible error by the circuit court and no merit to Dorsey's arguments, we affirm her conviction and sentence.

¶48. **AFFIRMED.**

**CARLTON, P.J., GREENLEE, WESTBROOKS, LAWRENCE AND McCARTY, JJ., CONCUR. BARNES, C.J., AND WILSON, P.J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. SMITH, J., NOT PARTICIPATING.**